THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JAY DEVORE, Plaintiff in Error.

*Opinion filed December 22, 1915.*

1. CRIMINAL LAW—*what is prejudicial error upon trial of one accused of uttering forged note.* On the trial of one accused of uttering a note known by him to be forged by his agent, who sent the forged note to the accused after selling the genuine note, if the agent testifies that he spent part of the proceeds of the original note miscellaneously and probably sent part to the accused, it is prejudicial error for the court, upon objection of the accused to such statement, to order the word "probably" stricken out, thus leaving a positive statement that the agent sent part of the proceeds to the accused.

2. SAME—*when evidence offered to show guilty knowledge should not be admitted.* Evidence offered for the purpose of showing guilty knowledge by the accused that his agent had been forging notes should not be admitted, where it relates to a transaction not shown to have any connection with the case on trial nor any bearing upon the question of the defendant's guilt or innocence in such case.

3. SAME—*when giving instruction as to purpose of admitting certain notes is error.* On the trial of one accused of uttering a note known by him to be forged by his agent, it is error to give an instruction stating that the sole purpose of admitting other forged notes in evidence was to show that the accused had guilty knowledge, where one of such other notes had also been introduced by the accused, in connection with other evidence, for the purpose of showing that he did not have guilty knowledge.

4. SAME—*when motion for new trial should be allowed.* A motion for a new trial should be allowed where the affidavits in support thereof sufficiently show that the material facts stated therein did not become known to the accused until after the conclusion of the trial, and that he was not able, in the exercise of due diligence, to learn of them sooner, and where it is also true that the books and papers taken from the office of the accused by the sheriff were not returned to him, notwithstanding his request, in time for him to investigate the numerous transactions testified to on the trial.

WRIT OF ERROR to the Circuit Court of Stephenson county; the Hon. OSCAR E. HEARD, Judge, presiding.

R. R. TIFFANY, for plaintiff in error.

P. J. LUCEY, Attorney General, A. H. MANUS, State's Attorney, and C. H. LINSCOTT, for the People.

Mr. JUSTICE COOKE delivered the opinion of the court:

At the December term, 1914, of the circuit court of Stephenson county an indictment was·returned charging that Jay DeVore, the plaintiff in error, and LaGrange W. Merrin, had on December 9, 1913, forged a certain note for $350, which was particularly described in the indictment, and had thereafter, on the same day, uttered and published said note to the First National Bank of Freeport, Illinois, as true and genuine. Merrin was tried, found guilty and sentenced to the penitentiary at the December term of court. DeVore obtained a continuance upon the affidavit of his attorney showing that the attorney was engaged as counsel in various cases which were set for trial at the December term of court, and had not had, and would not have, sufficient time to prepare for the trial of the case at that term. At the next term, being the March term, 1915, of the circuit court, DeVore again asked for a continuance, the motion being supported by his own affidavit, in which, among other things, it was stated that at the time of his arrest the books, papers and other documents necessary to prepare his defense were taken from him by the sheriff and were then in the possession of the State, and that he had therefore not had an opportunity to prepare his defense. This application for a continuance was denied. DeVore was placed upon trial at the March term of court and was by the verdict of the jury found guilty of the crime charged in the indictment. After overruling motions for new trial and in arrest of judgment the court rendered judgment upon the verdict and sentenced DeVore to the penitentiary at Joliet. DeVore has brought the record here for review by writ of error.

There is no evidence tending to show that plaintiff in error forged the note described in the indictment or any

of the other forged notes which were offered in evidence by the People. The contention of the People is that Merrin forged various notes, including the one upon which the indictment was based, and that DeVore, knowing that they were forged, uttered and published them to the First National Bank of Freeport. The contention of plaintiff in error is that Merrin sent him the forged notes in the usual course of business and that he had no knowledge that they were forged when he negotiated them.

From the evidence it appears that in 1895 Levi M. De-Vore, M. H. Wilcoxen and plaintiff in error, Jay DeVore, established a retail piano business in the city of Freeport under the firm name of the DeVore Piano Company. The business was conducted by the partners until 1899, when Levi M. DeVore and M. H. Wilcoxen sold their interests to Jay DeVore, who thereafter continued the business under the name of the DeVore Piano Company. Merrin was employed as a salesman by the DeVore Piano Company about 1897, and after plaintiff in error became the sole owner of the business continued to work for him in the same capacity. His territory, at least during the last eight or ten years, comprised certain counties contiguous to Stephenson county, in which the city of Freeport is located, his headquarters being at Polo, in Ogle county, during that period. Some time during the year 1909 Merrin, in addition to selling pianos for the DeVore Piano Company in the counties contiguous to Stephenson county, sold pianos on his own account which he purchased from the George P. Bent Company, of Chicago, and other manufacturers of pianos. In 1909 plaintiff in error borrowed $4000 from the First National Bank of Freeport and executed and delivered to the bank the note of the DeVore Piano Company for that amount, and to secure that note delivered to the bank, as collateral, notes taken in the name of the DeVore Piano Company from purchasers of pianos, aggregating more than $4000. This was the beginning of the business

relations between plaintiff in error, doing business under
the name of the DeVore Piano Company, and the First
National Bank of Freeport. Afterwards this loan was in-
creased to $5000, and the collateral security was increased
proportionately. The collateral security was adjusted by
plaintiff in error every six months by delivering to the bank
other notes to take the place of those which had been paid
during the six months' period or to make up the amounts
indorsed by DeVore as credits upon the notes in the hands
of the bank. During the year 1910 plaintiff in error ef-
fected an arrangement with the bank whereby the bank
undertook to discount the notes given to the DeVore Piano
Company by purchasers of pianos on a basis that would net
the bank seven per cent. Plaintiff in error also carried a
checking account with the bank in the name of the DeVore
Piano Company, and the proceeds of the notes, when dis-
counted, were placed to the credit of the company in its
checking account. When the arrangement was made with
the bank to discount the notes plaintiff in error requested
the bank not to send notices to the makers of notes dis-
counted for the DeVore Piano Company in case any such
notes should become due and remain unpaid but to notify
the DeVore Piano Company and the notes would then be
taken up by the company, the reason for making this re-
quest, as stated by plaintiff in error to the president of the
bank, being, that the purchasers of pianos might become of-
fended at receiving notices from the bank and the business
of the company would thereby be injured. From the evi-
dence it appears that plaintiff in error looked after the
collection of notes which were given upon sales of pianos
made by him, and that Merrin looked after the collection of
notes given upon sales of pianos made by Merrin and turned
over to plaintiff in error or to Mabel Altenbern, the book-
keeper for the DeVore Piano Company, the amounts re-
ported by him as collected upon such notes. So far as
the evidence discloses, no forgeries have been discovered in

any of the cases where plaintiff in error personally made the sales of pianos.

The note which plaintiff in error was by the indictment charged with uttering and publishing to the First National Bank of Freeport knowing it to have been forged was dated November 27, 1913. It purports to be the note of H. S. Garman and Alice L. Garman for $350, made at Adeline, Illinois, and payable to the order of the DeVore Piano Company on or before November 27, 1914, with interest at the rate of five per cent per annum from date until paid. It appears from the testimony of H. S. Garman, one of the purported makers, and Merrin, the principal witness for the People, that during the month of November, 1913, Merrin sold Garman, who lived in Ogle county, near Adeline, a piano belonging to the DeVore Piano Company for $350; that Garman and his wife, Alice L. Garman, thereupon executed and delivered to Merrin in payment for the piano a promissory note for $350, dated November 27, 1913, payable to Merrin; that Merrin indorsed this note and sold it to the Forreston State Bank of Forreston, in Ogle county, and it was paid by Garman at that bank some time in August, 1914. Garman testified that the note described in the indictment, and which was shown to the witness and offered in evidence by the People, is, with the exception of the name of the payee, a duplicate of the note which he signed and delivered to Merrin and which was destroyed by his wife after it was paid and surrendered to him. He further testified that he knew nothing whatever about DeVore and never heard of him in connection with the transaction. Merrin testified that after he had obtained the note from Garman he made out and sent to plaintiff in error a duplicate of that note; that he intended to use a blank form in which the name of the DeVore Piano Company was printed as the payee but by mistake used a form in which his own name was printed as the payee; that plaintiff in error returned the spurious note to him, accompanied by a letter,

which was offered in evidence by the People. This letter, written by plaintiff in error and addressed to Merrin, was as follows:

"Just received yours 27th inst. in which you inclosed a note for $350 dated the 27th inst. and made payable to your order, but you forgot to endorse the note to me, and I cannot use the note as it is, in fact don't see how I can use it all in the discount line, in the regular line, as never used a note like this before and I cannot explain what this change means, and it will only cause the banks to ask a whole lot of questions and queer the regular way of doing business, in fact it will spoil the whole line and am surprised that you would send such a note, as how do you expect I can use it without your endorsement and even then I do not see how I can use it, and especially since I am away and must depend on the girl to attend to it. It would be silly and the height of folly to use such a note and the only notes can use are such as have always had, not that I personally care anything about it, but it is a matter of business and they will begin to wonder what this change means and why notes are taken to you instead to the company as they should be. This is no time to make any such fool changes and make it perhaps impossible to turn the paper in the regular channels so you can see its a very delicate matter. And cannot afford to have anything happen to be turned down on discounts etc and do not wish to explain why you have made the change in the way of taking notes. Perhaps you intended that. I would use the note here, but do not see how I can do that, as it is too far away from where the note was taken. Herewith am returning the $350 note as cannot use it as you have made it payable, they all must be to the company as always before which you should know. Too bad you made this break at any such a time as this. Herewith some blank notes, the only kind to use as you must know if notes are to be discounted at all. Haste this mail."

Merrin further testified that upon receipt of this letter inclosing the duplicate or forged Garman note he destroyed that forged note and made out and forged the note described in the indictment, and either mailed it to the DeVore Piano Company or turned it over to plaintiff in error or to the book-keeper the next time he was in Freeport. He testified that it was made out by him about December 6 but was dated back to November 27. When asked what disposition he made of the proceeds derived from the sale of the genuine Garman note, he replied that he did not use

the money for his own business; that he paid it out miscellaneously, and that part of it was probably sent to DeVore. Upon objection being made by the attorney for the plaintiff in error to the statement that part of it was probably sent to DeVore, the court remarked, "Strike out the word 'probably.'" The witness further stated that he could tell what disposition was made by him of the proceeds of the note by referring to his memorandum, but no such memorandum was produced or thereafter referred to by the witness. He further testified that he could not recall any of the places where he paid out any of that money; that he paid it out as soon as it was received; that there were certain books which showed what disposition was made of the money, but that a Mr. Burrell had possession of those particular books. No such books were produced upon the trial nor was any further attempt made to show how Merrin disposed of the proceeds of the genuine Garman note. Addison Bidwell, president of the First National Bank of Freeport, testified, and plaintiff in error admitted, that on December 9, 1913, the note described in the indictment was brought to the bank, indorsed by plaintiff in error, and discounted by the bank, the proceeds, amounting to $343, being placed to the credit of the DeVore Piano Company in the checking account.

The People also introduced in evidence a note dated November 2, 1912, for the principal sum of $125, payable to the DeVore Piano Company, purporting to be signed by Lewis Hagerman; a note dated December 16, 1912, for the principal sum of $225, payable to the DeVore Piano Company, purporting to be signed by Myron Davis; a note dated September 16, 1913, for the principal sum of $140, payable to the DeVore Piano Company, purporting to be signed by David Hebrick; a note dated November 13, 1913, for the principal sum of $300, payable to the DeVore Piano Company, purporting to be signed by Frank J. Schelling; a note dated November 20, 1913, for the principal sum of

271 — 3

$200, payable to the DeVore Piano Company, purporting to be signed by Adolph Kappelman; a note dated December 22, 1913, for the principal sum of $300, payable to the De-Vore Piano Company, purporting to be signed by Charles Brantner; a note dated January 2, 1914, for the principal sum of $250, payable to the DeVore Piano Company, purporting to be signed by Charles Adams; a note dated January 15, 1914, for the principal sum of $300, payable to the DeVore Piano Company, purporting to be signed by F. A. Coffman; and a note dated February 6, 1914, for the principal sum of $200, payable to the DeVore Piano Company, purporting to be signed by William Steffe. Merrin testified that all of these notes had been forged by him and sent to plaintiff in error or to the DeVore Piano Company. Each purported to be made by some responsible farmer living in Ogle county. Bidwell, president of the First National Bank of Freeport, testified, and plaintiff in error admitted, that each of the notes above mentioned was indorsed by plaintiff in error and discounted at the First National Bank of Freeport, the proceeds being credited to the checking account of the DeVore Piano Company. The purported makers were also called as witnesses by the People and denied the making or signing of the respective notes purporting to bear their signatures.

Hagerman, whose name Merrin forged to the note for $125 above mentioned, testified that he had never purchased a piano from Merrin, but that he did, in the spring of 1912, purchase an old organ from him, for which he gave Merrin his note for $25, which he afterwards paid at the Mt. Morris bank, where it had been discounted by Merrin, and the note was then surrendered to him.

Myron Davis, the purported maker of the $225 note above mentioned, testified that while he knew Merrin by sight he had never purchased a piano from him or had any other dealings with him. He further testified that he never executed a note for $225 payable to the DeVore Piano Com-

pany, but that about January 1, 1914, he received a notice from the First National Bank of Freeport that his note for $225, payable to the DeVore Piano Company, was due; that he gave the notice to his banker at Mt. Morris, who said he was going to Freeport and would investigate the matter; that his banker afterwards reported to him that he had inquired at the First National Bank of Freeport and had been told that the notice had been sent to the wrong Myron Davis. Concerning this note the president of the First National Bank of Freeport testified that through inadvertence the note, when due, was sent to the bank at Mt. Morris for collection; that it was returned by the Mt. Morris bank with the statement that Myron Davis disclaimed having purchased a piano from the DeVore Piano Company; that he called plaintiff in error's attention to the report made by the Mt. Morris bank, and that DeVore came in a day or two afterwards and said it seemed the note was given by another man of the same name living in a different part of Ogle county, and that DeVore took up the note. It was found among the papers in the office of the DeVore Piano Company after plaintiff in error's arrest. Plaintiff in error was asked to explain why the DeVore Piano Company still had possession of the note, and he replied that there was a balance of $12.50 still due on the note. In support of this statement he offered in evidence an account book of the De-Vore Piano Company which had been kept by Miss Altenbern, the book-keeper. The entries in this book show the receipt of $100 from Merrin on January 8, 1914, and the further receipt of $130 from Merrin on January 26, 1914, to apply on this note, and a notation appears in connection with the last item that the "balance to raise" is $12.50, which the plaintiff in error said was the deficiency in the amount of interest remitted by Merrin on account of this note. With reference to this note Merrin testified that he forged the Myron Davis note and turned it over to plaintiff in error at the office of the DeVore Piano Company;

that when the note became due he received a telephone message from DeVore to come to Freeport at once; that plaintiff in error met him at the depot and said everything was all right except the Myron Davis note; that the bank had sent a notice to Davis; that he accompanied plaintiff in error to the office of the DeVore Piano Company to devise some way to get out of the dilemma, as both he and plaintiff in error knew that the note was not genuine; that they finally concluded that the only way to avoid suspicion was to locate Myron Davis in another part of Ogle county, and he (Merrin) was to make an effort to raise the money to pay the note and send it from another part of the county than that in which Davis resided; that he was unable to raise sufficient funds to pay the note, but did on January 7, 1914, send a draft for a portion of the note from Sterling, together with a letter which DeVore was to show the president of the First National Bank of Freeport in order to allay any suspicion he might have regarding the matter.

Certain letters were offered in evidence which have a bearing upon this note. On December 24, 1913, Merrin, from Mt. Morris, wrote plaintiff in error a letter, which was offered in evidence by the People, in which the following appears: "Note what you say urging settlements coming due. You may expect settlements from Myron Davis and R. Motter very soon." Under date of January 7, 1914, Merrin, from Sterling, Illinois, wrote plaintiff in error two letters, which were offered in evidence by the People. The first of these letters contained the following: "Enclosed dft. $100, am't rec'd of Myron Davis to apply on his note. Balance will be paid just as soon as piano is put in shape, but as it is quite always out I cannot possibly get the Sterling tuner I want until next week. You can depend on balance just as soon as this is attended to. I note what you said urging other settlements. All matters will be attended to promptly, but sometimes delay is caused by customers insisting on every little thing being satisfactory be-

fore settling. The demands are·sometimes unreasonable, but what am I to do? I cannot afford to incur their ill-will for fear of losing other sales." The other letter of January 7, 1914, from Merrin to plaintiff in error, was as follows: "I omitted stating in letter with dft. acc. Davis coll. that the circumstances you mentioned to me in regard to wrong party getting notice at Mt. Morris that the bank or party of the same name should be informed of the mistake—that the purchaser of piano did not live near Mt. Morris, but as piano was sold from there the dating and heading of note was made Mt. Morris. This should be attended to at once, for if not corrected it might leave a wrong impression and injure future business in that local-ity. This is very important, as I can then also explain it more satisfactorily." The records of the First National Bank which were introduced in evidence by the People show that the Myron Davis note was taken up by plaintiff in er-ror on January 6, 1914,—the day before the date of the two letters just set out.

Plaintiff in error testified with reference to the Myron Davis note, that as soon as he was informed by Bidwell, the president of the First National Bank, that the Mt. Morris bank reported that Myron Davis disclaimed any knowledge of the note which the bank had discounted, he telephoned Merrin to come to Freeport, and upon his arrival informed him of the report which had been communicated to him by Bidwell; that Merrin stated to him that the Myron Davis who had executed the note lived down near Sterling, but that he had taken so many notes from parties living at or near Mt. Morris that when he filled out the Myron Davis note he inadvertently dated it at Mt. Morris instead of Sterling; that Merrin said he would go to Sterling and at-tend to the collection of the note, and that a few days later he received a draft from Merrin for $100 to apply on that note, accompanied by a letter.

David Hebrick, whose name was forged by Merrin to the note for $140, testified that he was not acquainted with Merrin and had never bought a piano from him or had any other business dealings with him.

Frank J. Schelling testified that he purchased a piano from Merrin in November, 1913, and gave Merrin his note for $300, payable to Merrin individually; that he afterwards paid the note at the Leaf River bank and the note was then surrendered to him. The canceled note which Schelling paid was offered in evidence by the People. It differs from the forged note in that it was dated at Leaf River, November 4, 1913, and was payable to L. W. Merrin, while the forged note was dated at Mt. Morris, November 12, 1913, and was payable to the DeVore Piano Company. A letter written by Merrin from Freeport under date of November 14, 1913, addressed to Mabel Altenbern, the book-keeper for the DeVore Piano Company, was offered in evidence by the People and in part is as follows: "As Jay is not here and as I must take this morning train for Leaf River I herein inclose note of $300 from F. J. Schelling acc. Concord player, and also $50 in cash from W. H. Powell to apply on his note coming due. * * * Schelling owns good farm near Leaf River, 140 acres, also valuable town property, all clear and with highest credit."

Adolph M. Kappelman, whose name Merrin forged to the note for $200 above mentioned, testified that he was not acquainted with Merrin nor with DeVore and had never had any business dealings with either of them. With reference to this note a letter written by Merrin to plaintiff in error under date of November 24, 1913, from Forreston, which was offered in evidence by the People, contains the following: "Just reached here from Leaf River, having closed sale S. & C. No. 15 mahog. to Adolph Kappelman, a well-to-do German farmer near Leaf River. Enclosed find his note, in part, for $200. * * * Prospects good for

several sales between this and first of year and hope pianos may come promptly."

Charles Brantner, whose name Merrin forged to the note for $300 above mentioned, testified that he had never bought a piano from Merrin nor from the DeVore Piano Company· but that at one time Merrin tried to sell him a horse. A letter written by Merrin to plaintiff in error from Mt. Morris under date of December 24, 1913, and which was offered in evidence by the People, contains the following with reference to this note: "Closed the other style 3 S. & C. player piano to Charles Brantner and herein enclose his note for $300, five per cent int., in part settlement. He is a well-to-do farmer, owns 180-acre farm half way between Mt. Morris and Forreston."

Charles Adams, whose name Merrin forged to the note for $250 above mentioned, testified that he bought a Crown piano from Merrin in May, 1914, for $225, and paid for it by check. A letter written by Merrin under date of January 2, 1914, from Polo, addressed to plaintiff in error, contained the following with reference to this note: "Enclosed note $250 from Charles Adams in part settlement for S. & C. No. 12; also report of sale. Charge cash received $25 to my account." Merrin testified that he sold Adams a Crown piano which he had bought from the George P. Bent Company, of Chicago.

F. A. Coffman, whose name was forged by Merrin to the note for $300 above mentioned, testified that on April 6, 1912, he bought a piano from Merrin for $225 and paid for it at that time by check, and that he had not had any transaction with Merrin or with the DeVore Piano Company since. A letter written by Merrin to plaintiff in error from Polo under date of January 15, 1914, contains the following: "I sold No. F Concord yesterday to F. A. Coffman, reliable farmer near Polo, who owns fine farm clear of indebtedness. Enclosed find note $300 for balance. Please

give me due credit and charge to my account the $50 cash bal. rec'd on this sale."

With reference to the note for $200 purporting to be signed by William Steffe, Merrin testified that he did not sell any piano or musical instrument to Steffe and that he had forged the note. A letter written by Merrin to plaintiff in error refers to this note in the following language: "I send you by mail sale report and note for $200 received of William Steffe in part settlement for S. & C. style 15, No. 48912. Charge me to the $25 cash rec'd on this sale. He would not buy piano at this time and pay interest. As the time for payments is very long and customer's credit first-class I could not afford to lose sale on account of the interest."

Bidwell, the president of the First National Bank of Freeport, also testified that the bank discounted a note for $300, dated March 11, 1914, payable to the DeVore Piano Company and purporting to be signed by Charles A. Myers, and a note for $350, dated March 21, 1914, payable to the DeVore Piano Company and purporting to be signed by John D. Newcomer; that these two notes were brought to the bank and indorsed by Mabel Altenbern, the book-keeper for the DeVore Piano Company, and the proceeds were credited to the checking account of the company; that the bank also discounted a note for $350, dated May 15, 1914, payable to the DeVore Piano Company and purporting to be signed by V. H. Bovey, and a note for $250, dated August 4, 1914, payable to the DeVore Piano Company and purporting to be signed by Andrew Schelling; that these two notes were brought to the bank and indorsed by Merrin; that the proceeds from the first of these notes were credited to the checking account of the DeVore Piano Company, but the witness did not know whether the proceeds from the second note were credited to the piano company or to Merrin. Merrin testified that the four notes last mentioned were all forged by him. These notes were in-

troduced in evidence by the People. Merrin testified that he did not sell Charles A. Myers any musical instrument. The Myers note was accompanied by a letter, dated March 12, 1914, signed by Merrin and addressed to Mabel Altenbern, which was, in part, as follows: "I also inclose note of Chas. A. Myers for $300 in part for S. & C. player; expect to sell Kimball piano received in exchange to church. Mr. Myers owns 160-acre farm, paid for, and has bought 40 acres adjoining; no one has any better credit." Merrin further testified that he sold John D. Newcomer a piano for $190, but did not state whether Newcomer paid cash or gave a note for that amount. Newcomer was not called as a witness. A letter from Merrin to Mabel Altenbern, dated March 21, 1914, contained the following with reference to the John D. Newcomer note: "Also find enclosed note $350 from John D. Newcomer in part settlement for No. M player. This is a good sale, as he is neighbor and great friend of H. S. Garman, to whom I sold last fall. These two sales will lead to at least three other sales, as both Garman and Newcomer are fine people. Newcomer owns his farm clear (160 acres) and nice home south of German Valley."

The People also offered in evidence a note for $315, dated April 15, 1914, purporting to be signed by J. E. Ainsworth and Nettie B. Ainsworth; a note for $250, dated April 17, 1914, purporting to be signed by C. A. Bisker; a note for $360, dated May 6, 1914, purporting to be signed by Elizabeth E. Garman; a note for $275, dated May 21, 1914, purporting to be signed by R. A. Bokker; a note for $200, dated May 27, 1914, purporting to be signed by C. F. Kilker; a note for $300, dated June 2, 1914, purporting to be signed by John Thomas; a note for $250, dated June 12, 1914, purporting to be signed by William Shafer; a note for $250, dated July 1, 1914, purporting to be signed by George W. Beard; a note for $250, dated July 3, 1914, purporting to be signed by August Schnelle; a note for

$250, dated August 20, 1914, purporting to be signed by Henry Lohafer; and a note for $250, dated September 3, 1914, purporting to be signed by Cornelius J. Cordes and Mary E. Cordes. All of these notes were made payable to the DeVore Piano Company, and Merrin testified that he had forged each of them and after indorsing them had taken them to the First National Bank of Freeport, where they were discounted and the proceeds were credited to the checking account of the DeVore Piano Company. He seems to have obtained authority to indorse notes payable to the DeVore Piano Company under the following circumstances: Some time during February or March, 1914, plaintiff in error went to Iowa, where he remained until his arrest, in September, 1914. Apparently he left Merrin in charge of the business at Freeport. He testified that soon after his departure for Iowa he received a letter from Merrin stating that Merrin had turned over to the First National Bank of Freeport two notes but there was no one at Freeport authorized to indorse notes payable to the DeVore Piano Company, as Miss Altenbern was no longer with the company, and that the bank wanted the notes indorsed. Plaintiff in error testified that in reply he wrote the following letter, which was offered in evidence on behalf of plaintiff in error:

"MISSOURI VALLEY, IOWA, *April 24, '14.*

"*L. W. Merrin, Forreston, Ill.*

"DEAR SIR:—Have delayed answering yours 20 inst. as have not been feeling quite as well the past few days, however, better again today.

"I am very glad that you are looking after the discount line at the First National Bank, and as per the wishes of Mr. Bidwell I hereby authorize you to make the endorsement of the DeVore Piano Co. name as per yourself on such good notes as you may wish to discount to the First National Bank of Freeport, Ill. Such notes as are discounted to this bank the proceeds to be applied in reducing the present line, as wish to reduce the line as rapidly as possible. Also endorse for the DeVore Piano Co. the two notes you mentioned as having discounted to the First National Bank at Freeport, Ill. Also authorize you to sign the DeVore Piano Co.

signature to all checks necessary to take up the maturing notes in the discount line at the First National Bank at Freeport, Ill.

"You will deliver this letter to Mr. Bidwell, and tell him that I will return home just as soon as it is possible and my health will permit of it. I am doing as well as could be expected, having the very best care and attention here. It may be two or three weeks before I can return home.

"I will write to you more fully in a few days when I am feeling better than at this time.

"Very truly yours,

DEVORE PIANO Co.

. Jay DeVore, *Mgr.*"

The People also offered in evidence extracts from the discount records of the First National Bank of Freeport, from which it appears that the bank had discounted a note for $250, dated June 29, 1912, payable to the DeVore Piano Company July 1, 1913, purporting to be signed by H. H. Newcomer, and that $100 was paid on the note June 28, 1913, and the balance of $150 on July 14, 1913. These payments, as well as all others made upon notes discounted at the First National Bank, were made by plaintiff in error. Newcomer testified that on June 15, 1908, he purchased a piano from Merrin for $190 and paid for it in cash, and that he had never executed any note payable either to Merrin or to the DeVore Piano Company. Merrin testified that in the summer of 1911 or 1912 he had a conversation with plaintiff in error at the office of the DeVore Piano Company about Newcomer; that the plaintiff in error had called him in off the road by telephone and asked him if he had any money or notes; that he (Merrin) told plaintiff in error he had no money or notes; that plaintiff in error said something must be done—that he had an obligation to meet the following day; that plaintiff in error said a "good note," as Merrin says it was called, would answer the purpose, and that he (Merrin) forged the name of Newcomer to a note for $250, which DeVore discounted at the First National Bank of Freeport and which is the note referred to in the discount records of the bank. The dis-

count records of the bank further show that the bank discounted two notes, each for $150, dated November 6, 1912, payable to the DeVore Piano Company and purporting to be signed by Daniel H. Newcomer, and that these notes were paid during the year 1913. Daniel H. Newcomer produced two canceled notes which he testified he gave to Merrin on November 11, 1912, in payment for a piano purchased from Merrin. Both of these notes were dated November 11, 1912, and were payable to L. W. Merrin. Each was for the principal sum of $105. Newcomer testified that the two notes which he produced upon the trial were the only notes he had ever given to Merrin, and that he paid them at the Mt. Morris bank and they were surrendered to him by that bank. The discount records of the bank also show that the bank discounted a note for $225, dated January 4, 1913, payable to the DeVore Piano Company January 4, 1914, purporting to be signed by R. S. Motter and Mary L. Motter, and that this note was paid January 17, 1914. Motter testified that in July, 1912, he purchased a piano from Merrin and gave him his note for $135, dated August 27, 1912; that he afterwards paid the note to L. F. Ayres, at Leaf River, and the note was surrendered to him. Motter produced the canceled note, which was payable to and indorsed by L. W. Merrin. The piano sold to him by Merrin was one of DeVore's pianos. He denied having executed any note payable to the DeVore Piano Company for $225 or any other amount. Two letters appear in the record which refer to the Motter note. The first of these letters, dated December 24, 1913, addressed to plaintiff in error and signed by Merrin, contains the following, which has been hereinbefore quoted in connection with the Myron Davis note: "You may expect settlements from Myron Davis and R. Motter very soon." The other, written by Merrin to plaintiff in error under date of January 15, 1914, is, in part, as follows: "Cannot possibly get tuner to go to Motter's until first of week, at

which time I will get Motter settlement." The discount
records of the First National Bank of Freeport further dis-
close that the bank discounted a note for $275, dated De-
cember 23, 1910, purporting to be signed by Klaas A. Bush,
payable to the DeVore Piano Company December 23, 1911;
that DeVore paid the bank $100 on this note December 9,
1911, and the balance of $175 on December 21, 1911.
Merrin testified that in 1910 he sold a piano to a man by
the name of Klaas Bass; that Bass gave him a note for
$275, dated December 23, 1910, payable to the DeVore
Piano Company; that he discounted the note at the Ex-
change Bank of Polo and made a duplicate of the note,
which he sent to DeVore at Freeport; that he had a con-
versation with DeVore a short time before the forged note
became due, telling him to see the bank in time so a notice
would not be sent to Bass; that he afterwards saw DeVore
and told him that Bass had received a notice, and that
Henry Bass, a son of Klaas Bass, had come to Freeport on
the train that day to see about the notice that had been
sent to his father; that he (Merrin) gave plaintiff in er-
ror the money to take up the note before Bass reached the
bank with the notice; that Bass called at the office of the
DeVore Piano Company inquiring about the note, but as
it looked like the notice was addressed to Bush, plaintiff
in error explained that it had been received by the wrong
party.

According to Merrin's testimony some of the notes
which he admits he forged were made out in the office of
the DeVore Piano Company and others in his room at the
hotel in Freeport, and he testified that plaintiff in error was
present when some of them were forged. Merrin made
out and furnished to plaintiff in error a statement of the
financial condition of the maker or purported maker of each
note discounted at the First National Bank of Freeport,
and these statements were turned over to the bank with
the notes when offered for discount. In some instances

the bank verified the statements by making inquiry of some bank in the locality in which the purported maker resided, and invariably found the statements substantially correct. Merrin testified that the statements which accompanied the forged notes were written by him at Freeport and that he frequently discussed the matter with DeVore before writing the statements; that the purpose of these conversations was to make a favorable statement so the bank would accept the note, and that he and DeVore frequently revised the statements in order to accomplish that purpose; that at DeVore's suggestion he kept on hand at Freeport a supply of letter-heads of various hotels, as DeVore thought he should use letter-heads of hotels in the towns near which the purported makers of the notes resided, in writing the financial statements. He further testified that both he and plaintiff in error kept a list of the forged notes showing when they matured, so that they would know just when a forged note would have to be taken up at the bank, and that when a forged note was taken up it was crossed off the list. Merrin produced the list kept by him and it was offered in evidence by the People. He testified that the other list was kept at the office of the DeVore Piano Company. Plaintiff in error testified that the only list kept at the office of the DeVore Piano Company of which he had any knowledge was one kept by the book-keeper containing all bills payable, which included all notes discounted at the bank and remaining unpaid and showing at a glance when they would become due. As plaintiff in error had not been at his office for seven months before his arrest and as the sheriff had taken possession of the books and papers of the DeVore Piano Company immediately after the arrest of plaintiff in error, his attorney served notice upon the State's attorney to produce the list referred to, but it was not produced.

With reference to the statements of the financial condition of the makers of notes taken by Merrin, plaintiff in

error testified that his instructions to Merrin were to send financial statements with all notes taken by him, and that such statements were furnished with all notes turned over to the company by Merrin.  He denied having had any conversation with Merrin with reference to writing any financial statement in order to make it appear that the maker was good.

The substance of Merrin's testimony on his direct examination, other than that above set out, is that plaintiff in error knew that the notes which were sent to him by Merrin and which were discounted at the First National Bank of Freeport were forged, and that the matter was a subject of frequent conversation between Merrin and plaintiff in error.

On cross-examination Merrin was asked about various notes taken by him upon sales made by him of pianos for the DeVore Piano Company.  He admitted that he sold Ernest Smith, of Seward, a piano belonging to the DeVore Piano Company, taking a note in his own name, which note he sent to the George P. Bent Company, of Chicago, as collateral for his personal indebtedness, and he admitted that he issued a forged note for the price of the piano and sent it to the DeVore Piano Company.  He was asked about various notes, which were particularly described to him, and admitted that he had sold or discounted at Polo more than thirty notes payable to the DeVore Piano Company, the aggregate of these notes amounting to several thousand dollars.  He testified that he indorsed the name of the DeVore Piano Company on each of these notes, and that all of such indorsements were made before he had received written authority from plaintiff in error to indorse notes made payable to the DeVore Piano Company.  His testimony with reference to his authority to indorse notes made payable to the DeVore Piano Company before receiving the authority from plaintiff in error by the letter dated April 24, 1914, was, first, that he had no such authority, and then that he

considered that he had the authority to do so. According to his testimony some of the notes which he discounted at Polo were genuine notes, having been given in payment for pianos sold by him for the DeVore Piano Company, and some were forged by him. He also admitted that in some instances he sent to the DeVore Piano Company forged copies or duplicates of the genuine notes taken by him upon sales of pianos for the DeVore Piano Company, and that he indorsed and discounted the genuine notes at Polo.

Plaintiff in error denied having had any of the conversations with Merrin regarding forged notes which Merrin detailed. He testified that he had never authorized Merrin to indorse any notes for the DeVore Piano Company until the letter of April 24, 1914, was sent at Merrin's request authorizing him to indorse notes to be discounted at the First National Bank of Freeport, the proceeds to be placed to the credit of the DeVore Piano Company. He testified that he never forged a note and never requested Merrin to forge a note; that he never saw Merrin forge a note and did not know that Merrin wrote the names of the purported makers on the notes about which he had testified; that he had no understanding with Merrin that he was to forge notes and never talked to him about forged notes; that he had never indorsed and discounted at the First National Bank of Freeport a forged note knowing it to be forged; that Merrin was employed by him to sell pianos; that Merrin also sold pianos on his own account purchased by Merrin from the George P. Bent Company and the Story & Clark Company; that he (DeVore) had no connection with Merrin's business with those companies; that Merrin was indebted to the DeVore Piano Company, the indebtedness amounting to several thousand dollars; that at times Merrin had sent him notes which he reported he had taken upon sales of his own pianos and had been given credit for those notes on his account with the DeVore Piano Company.

The letters written by plaintiff in error to Merrin were not signed, and frequently abbreviations were used which render the letters unintelligible to one not familiar with the subject matter of the letters. Many statements are contained in the letters which could only be understood by one familiar with the subject matter in connection with which they were made and which is not disclosed by the letters. Neither Merrin nor plaintiff in error was asked to explain the meaning of any of these abbreviations or to state the subject matter to which the statements in the letters referred. Plaintiff in error's explanation of his failure to sign any of the letters written by him to Merrin is that Merrin frequently became intoxicated on Sundays, and had, while in this condition, lost letters and other papers, and that he did not sign the letters because he was afraid Merrin might lose the letters and they might thereby get into the hands of some of his competitors. The unsigned letters written by plaintiff in error to Merrin which the People offered in evidence are as follows:

*"11-12-'13.*

*"Whit*—No mail from you, 'and you certainly must know the importance of getting very full information here without delay, I am certainly amazed that you have delayed as you have. I can not do anything till get word from you what Powell and Gibson are going to do about meeting their notes. Presume they are going to pay them or would have had some word that they wanted a short extension. The office girl told you that I had three notes amounting to over $300 that had to pay the 22d and 23d and that you would have to hustle to help take care of this matter, have not had a word from you with remittance or any settlements—the promised money you said you would send have not received—I simply must have it and other money to protect maturing notes. One with the U... fols the 22d $200 and it must be paid or it will raise ned and absolutely destroy that line—on the strength of your promise I sent cash to Chicago that should have kept for the U. folks the 22d inst. ·now write me at once and send the amount you said you would last week—and how much more can you get to me by the 18th or 19th the latest—must know as must get ready for this emergency, must be done and you know what it means in the future dare not let this matter go unpaid or it will spoil that whole line of credit and that will never do—its a dandy line and

271 — 4

must be protected—write me quick just what I can depend on—
Am waiting to get settlements so as to know what to do with notes
maturing the P. note and the Gibson note and savage is also ma-
turing—Just received your telegram in which you say 'Everything
all right, but should come without delay advise Forreston.' But
that does not tell me what I wish to know, but perhaps you are
writing today and giving matters the attention you should, if not
get in touch with me at once as it is too important to delay one
minute—cannot afford to delay and injure credit at the bank on
account of allowing paper to go past due on the Pow and Gib
matters and eastern notes must be paid as you know when they
are due and cannot do anything else but pay them the day they
fall due—

"Have a dandy line of fine prospects but to save my life, I can
not hurry them to close up, they are alright but so slow, and that
is what is worrying me as it looks as if cannot get them closed
in time to protect the matters on those eastern notes, it makes me
so nervous with worry, as it just seems that cannot get the cash
and cannot get money on collections, they are rotten and its h—l,
but after these eastern matters are out of the way everything will
be fine, plenty of time then to take care of things and by that time
I will have things coming I am sure, but find it takes time to get
them going in a new place and field—I wrote you about the player
and when it would be shipped, but what I want now is cash and
it must come as you know if not I will have to suffer, my credit
and that would be terrible on the dandy line—Haste to get this
mail.

"Shall wait here for word before I can say or do anything."

                                                    "*11-23-'13.*

"*Whit*—Don't send any more telegrams, see and do not send
any mail from Fre... as do not want any one to know where I
am working till I am all thru with the territory. I have reasons
why you should send all mail from other points then Fre... Its
important that you do as I tell you in this matter. Intended to
tell you about this before, but I forgot to call your attention to
it—You know how other salesmen follow in, see and wish to
work quietly and without any one knowing where I am working
new territory."

                                                "*Thanksgiving.*

"*Whit*—Please do not forget the 'five or six days' as its im-
portant to take care of that favored matter as you know. Have
another Leh matter the fifth inst. Let me hear from you."

                                                    "*12-19.*

"Yours today received this ten P.M.—I made arrangements for
you to meet the party Sunday as you agreed, and you will come

without fail, get here by some time about noon—since letter came I talked with the party and he said by noon would be alright and soon enough.

"Be sure to keep the appointment and go over matters I mean in a quiet way, and select out or systematize the names of the people so that all are in order, I mean those north one coc right after the other so as to lose no time in going to their homes, and the same way in all directions. I did not as yet show the statement and do not intend till I get back Monday morning, see thought would not till then as then would not be writing in things that should not till I go and see those people with him. I told him I would go as you had to look after deals for Xmas, see.

"Just get the names in order as I have suggested, see. It will save time and in a general way you can have a nice visit with the party.

"Everything working nicely only you should come and do as I have told you and as I have arranged as we talked about seeing party Sunday see. Be sure to come and then Monday you can get back to work and not lose any time. I will see you here late Sunday night or Monday morning, may not come out until early train Monday morning the train that leaves there at 2:30 A. M. or the one that gets here at 2:20 A. M. leaves there about eleven at night, Sunday night.

"Party at 58 where he stops.

"I am handling the prospect alright and will get the deal thru in good form, only you must attend to it Sunday and do as I have suggested see and do not fail for any reason.

"Tried to get you by phone tonight after received your letter but I could not. I leave on the 2:20 A. M. train in the morning.

"Haste. Come prepared to have a real pleasant talk and everything will be all right. Thought would not show the book till I got back and then nothing would be written or said till I was here to go with the party to look after those important prospects and sales, see. I had a dandy talk with party tonight and intimated what I begin to think and its going to be fine and I can swing the big deal satisfactorily, see. Haste."

Plaintiff in error was arrested by the sheriff of Stephenson county at Missouri Valley, Iowa, on September 27, 1914. A nephew of plaintiff in error resided at Missouri Valley. The sheriff testified that he met plaintiff in error on the street about eleven o'clock at night; that when plaintiff in error recognized him he asked the sheriff what he was doing there, to which the sheriff replied, "I came here

to get you;" that plaintiff in error inquired, "What is the trouble?" and the sheriff replied, "With regard to the phony notes at the First National Bank;" that plaintiff in error said, "There must be some mistake; I don't know anything about what you are talking about," and that the sheriff replied, "Jay, you might just as well come across; I arrested Merrin last night before I came from Freeport; you might as well take your medicine;" that plaintiff in error then asked him what he was going to do, and he replied that that rested with plaintiff in error,—whether he would go back without requisition papers,—and that plaintiff in error said he would go back; that at the request of plaintiff in error they then went to his nephew's office, where they remained until about 2:30 o'clock the following morning; that upon arriving at the office plaintiff in error telephoned his nephew, requesting him to come to the office; that upon the arrival of the nephew at the office plaintiff in error said to his nephew, "This is the man that I have been expecting from Freeport; you just go ahead and tell the sheriff what I had intended to do," and that the nephew said that plaintiff in error had made all arrangements to go back to Freeport the following day and that he was going to tell Bidwell all about the matter; that during his conversation with plaintiff in error the witness said, "Jay, you must have known there was something crooked in the discount line," and plaintiff in error replied, "I didn't; I never suspected a thing;" that the witness then said, "After the Smith & Barnes deal came up weren't you suspicious after that time?" and that plaintiff in error replied, "Who told you about that deal?" and said he did become suspicious and told Bidwell not to increase the discount line; that he then asked plaintiff in error if he did not make an investigation at that time, to which plaintiff in error replied that there was an investigation made at that time and that he did become a little suspicious; that plaintiff in error then asked him if there was not some way in which the matter

could be fixed up, and said, "With Mr. Merrin's ability and my own it wouldn't take but a short time to straighten things up; in fact that line has been reduced something like $1800 or $2000 already." Plaintiff in error denied that his nephew in his presence stated to the sheriff, in words or in substance, that plaintiff in error was going home the next day and was going to tell Bidwell; that his nephew never lived in Freeport and that he did not think his nephew knew Bidwell. He further denied telling the sheriff that the discount line had been reduced, and says he did not know that to be a fact himself at that time.

Bidwell, the president of the First National Bank of Freeport, called as a witness on behalf of the People, testified that after plaintiff in error was brought back to Freeport by the sheriff plaintiff in error was taken to the office of the witness; that there were present in the office the sheriff, John Bruce, one of the directors of the bank, the State's attorney and his assistant, and an attorney representing the bank; that plaintiff in error said, "Gentlemen, I am just as innocent of any wrongdoing in this connection as any of you here; all this matter can be explained, and I will make a statement at the proper time explaining the transaction; you will be astounded when you know all the facts in connection with this matter;" that plaintiff in error was then asked what was done with the proceeds of the paper which was discounted; that he was asked who got the proceeds of that money in the bank, and he said that in the final settlement Merrin would have credit for that; that he was asked further questions but declined to answer unless he had an attorney present, and that plaintiff in error was not represented by an attorney at that interview.

John Bruce, called as a witness by the People, testified that he was at the State's attorney's office the night plaintiff in error was brought back to Freeport by the sheriff; that plaintiff in error was asked about the DeVore Piano Company's notes which had been discounted at the First

National Bank; that he said he did not want to make any statement because he was not represented by an attorney; that plaintiff in error went to the telephone and attempted to get into communication with a certain attorney but was unable to locate him; that he said he had discounted notes at the bank and had received the proceeds and had used the proceeds in taking up other notes that were maturing; that he asked whether there was not some way in which the matter could be settled without loss to the bank, stating that he thought if he could see and talk with Merrin he could arrange to settle it in a reasonable length of time; that he further said there were a good many things to be explained; that he was innocent and thought the paper was good paper; that subsequently the witness and Bidwell had another conversation with plaintiff in error to determine whether some plan could be devised by which the bank would be protected from loss.

The sheriff who arrested plaintiff in error testified that when he brought plaintiff in error back to Freeport he took him from the train directly to the office of the State's attorney; that when they entered the office plaintiff in error said that he did not like to talk without consulting an attorney, and that he attempted to communicate with an attorney over the telephone but could not locate him; that the State's attorney and Bidwell talked to the plaintiff in error; that he said that he was innocent and that all would be explained in time; that he was asked if Merrin ever received any profit from the notes which were discounted, and that he said he would eventually; that he said Merrin owed him a large sum of money; that they asked him whether he gave Merrin credit when he discounted the notes received from him, and that he said he did not but that eventually Merrin would get credit; that there was considerable talk, and plaintiff in error asked whether there was not some way to adjust the matter without loss to the bank.

Plaintiff in error did not deny having made the statements in the office of the State's attorney as detailed by the witnesses for the People, but testified that he did not know the notes were forgeries until he was so informed by the sheriff and the officers of the bank, and that he asked whether the matter could not be fixed up because he felt he was bound to protect the bank from loss if he was able to do so.

During his cross-examination Merrin was asked whether he was acquainted with Charles F. Thompson, of the Smith & Barnes firm. He answered that he was. In response to questions he stated that he met him and talked with him at a hotel in Freeport in December, 1913; that he was called in to see Thompson and that the conversation was about pianos and notes. He was then asked if he did not in that conversation break down and cry and say to Thompson, "If I was only guilty of embezzlement," and denied that anything of the kind occurred. He denied that in that conversation he stated to Thompson that if he was only guilty of embezzlement he would not feel so bad, but that he had done some funny work with the DeVore Piano Company notes, and if Jay DeVore ever found it out he would make it pretty hot for him.

Charles F. Thompson, called as a witness by plaintiff in error, testified that he had been connected with the firm of Smith, Barnes & Strober as traveling salesman and expert auditor for two years; that during December, 1913, he had a conversation with Merrin at a hotel in Freeport with reference to pianos and notes; that in that conversation Merrin stated to him, "If I was only guilty of embezzlement I wouldn't feel so bad, but I have done some funny work with the DeVore Piano Company's notes, and if Jay DeVore ever finds it out he will make it pretty hot for me." He further testified that at the time of this conversation the DeVore Piano Company owed the firm of Smith, Barnes & Strober about $8600 for pianos purchased, and

there was still due that firm between $6000 and $7000, secured by collateral notes.

On rebuttal Merrin was permitted to testify, over the objection of plaintiff in error, that in December, 1913, he had a conversation with plaintiff in error at Dubuque concerning a "Smith & Barnes deal;" that the conversation did not relate to any forged notes brought in by Merrin and discounted at the First National Bank, but related to other forged notes connected with Smith & Barnes pianos brought in to the DeVore Piano Company by Merrin; that in that conversation he talked to DeVore about Thompson, the representative of the Smith & Barnes Company, who was then in Freeport; that plaintiff in error wanted him to assume the entire blame in the Smith & Barnes transactions, saying if both were implicated it would expose everything; that he (Merrin) replied that it was pretty hard to take all the blame—that he had enough without taking on more. On cross-examination Merrin testified that his meeting at Dubuque with plaintiff in error was arranged by telegrams; that he was informed by Miss Altenbern that a representative of Smith & Barnes was in Freeport, and he sent a telegram to plaintiff in error requesting him to meet him (Merrin) at Freeport or some other town; that plaintiff in error replied, by telegram, that he would meet him at Dubuque, and that after meeting plaintiff in error at Dubuque he returned to Freeport and met Thompson, the representative of Smith & Barnes.

Plaintiff in error admitted meeting Merrin at Dubuque. He testified that Merrin at that meeting told him that Thompson, the representative of Smith & Barnes, was in Freeport to check up the accounts; that Merrin said that he (Merrin) had collected and appropriated considerable money on Smith & Barnes sales which had not been reported, and he wanted to talk the matter over with plaintiff in error and wanted plaintiff in error to protect him as much as he could in case there was trouble. Plaintiff in

error further testified that nothing was said in that conversation about forged notes.

The foregoing is, in substance, all the evidence of any consequence bearing upon the guilt or innocence of plaintiff in error and is set out thus fully because the sufficiency of the evidence to sustain a judgment of conviction is questioned.

Aside from the direct testimony of Merrin that plaintiff in error was a party to the forgeries committed by him and aided and abetted in the commission of these offenses, there is evidence on the part of the People which is unexplained by plaintiff in error, tending to prove his guilt. When all the evidence is carefully weighed and analyzed, however, there is a grave doubt of its sufficiency to sustain a conviction. No motive is shown why plaintiff in error should have indulged in the practices testified to by Merrin, and it does not appear that he profited in any way from the commission of these forgeries. On the contrary, it appears that he has lost several thousand dollars as a result of Merrin's transactions. It is difficult to conceive how plaintiff in error profited in any way by permitting Merrin to negotiate genuine notes which he took from parties to whom he sold pianos and to send him notes which admittedly were forgeries. It does not appear that plaintiff in error received any of the proceeds from the negotiation of the genuine notes. While it is shown that Merrin made remittances, from time to time, purporting to be collections from parties whose names were forged to notes held by the bank, it is only by inference and speculation that it can be said that these remittances were a part of the proceeds received by Merrin from the negotiation of genuine notes. The total amount received by Merrin from the sale of genuine notes taken in payment for pianos of plaintiff in error does not appear, but it amounted to several thousand dollars. Merrin does not explain what became of this money. Had it been a part of the scheme by which he and plaintiff

in error were negotiating forged paper for him to negotiate the genuine notes it would have been easily thus explained, but he does not so testify. No inferences can be indulged against plaintiff in error in this particular, and it will not be presumed that he received the money thus secured by Merrin.

In detailing what transpired with reference to the genuine note executed by H. S. Garman and his wife Merrin testified that he sold it to the Forreston State Bank. He was asked what disposition he made of the proceeds, and stated that he paid it out miscellaneously, and that part of it was *probably* sent to DeVore. This was objected to, the objection amounting to a motion to strike. The court, without passing specifically upon the motion, ordered the word "probably" stricken from the answer. The answer as made by Merrin was simply a speculation or a guess as to what disposition he had made of the proceeds from the sale of this note and should have been stricken upon the motion of plaintiff in error. By simply striking the word "probably" from the answer the court eliminated every speculative feature from the answer and rendered it a positive statement that Merrin had sent part of it to plaintiff in error. This was prejudicial error, as it was a material question in the case, as indicating the guilt or innocence of plaintiff in error, whether he profited from the sale of the genuine notes taken by Merrin.

The question of the guilt of plaintiff in error on the evidence was exceedingly close, and it was of the utmost importance that no error in regard to any material feature of the case should intervene. The People were permitted, over the objection of plaintiff in error, to offer proof relative to what is referred to as a "Smith & Barnes deal." This evidence was no doubt admitted upon the theory that it tended to show guilty knowledge on the part of plaintiff in error. What the Smith & Barnes deal was, what forgeries, if any, were committed in connection with it, and

by whom, does not appear.  It does definitely appear that such forgeries as were alleged to have been committed were not in connection with any paper which had been discounted by the First National Bank of Freeport.  The State failed utterly to show wherein this evidence had any bearing upon the guilt or innocence of plaintiff in error or any connection whatever with the case, and it should not have been admitted.  The testimony of Merrin in this connection that plaintiff in error asked him to assume the entire blame in the matter and stated that if both were implicated it would expose everything, and that he replied that it was pretty hard to take all the blame,—that he had enough without taking on more,—plainly infers that plaintiff in error was guilty of forgery or some unnamed misconduct in the Smith & Barnes matter.

The testimony in regard to the forged notes which were discounted at the bank by Merrin and those which were discounted by Miss Altenbern during the absence of plaintiff in error from Freeport, and without any knowledge by him that such notes existed or had been discounted and negotiated, and also the testimony of the officers of the bank in reference to the records of the bank showing the discounting of other notes than those introduced in evidence and which were alleged to be forgeries, was admitted without objection, and its competency cannot now be challenged or discussed.

The notes introduced in evidence which are admittedly forgeries, together with other exhibits, have been certified and presented with the record for our inspection.  The for- . geries were skillfully executed and were well calculated to deceive anyone who was not familiar with the genuine signatures of the purported makers of the notes.  The bank officials never had occasion to question the genuineness of any of this paper from its appearance.  There is nothing in the appearance of these notes, either when examined singly or when compared with each other, to arouse a sus-

picion in the mind of anyone that any two of them were written by the same person.

Complaint is made of the giving of three instructions on behalf of the People. The first instruction complained of stated that plaintiff in error was a competent witness, and in determining the credibility that should be accorded his testimony the jury had the right to take into consideration the fact that he had been corroborated or contradicted by credible evidence or "by facts or circumstances in evidence." The instruction then stated that if the jury believed that any witness had willfully and corruptly testified falsely to any material fact they had the right to disregard the testimony of such witness, except in so far as it was corroborated by other credible evidence or "facts *and* circumstances in evidence." It is contended that by this instruction a higher degree of evidence is required to corroborate a witness than to discredit him. While the instruction is technically incorrect in this regard, it is inconceivable that the jury could have been misled by it.

The second instruction complained of dealt also with the credibility of witnesses, and stated that even though the jury might believe that any witness had accidentally or intentionally been mistaken in his testimony as to any material fact, if such witness did not deliberately and willfully testify falsely as to such matter, then the jury had no legal right, on that ground alone, to entirely disregard the testimony of such witness. It is insisted that by this instruction the jury were told that even though they believed a witness had been mistaken in his testimony as to a material fact they might still believe such testimony, as that part of the instruction which told them they had no right on that ground to entirely disregard the testimony of any such witness refers to the testimony given accidentally or unintentionally. While the instruction might have been so drawn as to more clearly express its meaning, we do not think it possible that any jury could so misunderstand or misin-

terpret the meaning intended to be conveyed by this instruction.

The last instruction complained of stated that there had been admitted in evidence certain promissory notes other than the one charged in the indictment, and the jury were instructed that this evidence could not be used to show that plaintiff in error had committed other offenses, or was guilty of forgery or of uttering or publishing other forged instruments, in order to lead to the inference that he would be more likely to commit the offense charged in the indictment, but that such evidence was admitted solely on the ground that it might tend to show that plaintiff in error had guilty knowledge of the fraudulent character or forgery of the promissory note named in the indictment, if such note was forged or fraudulent. The court erred in giving this instruction. The Myron Davis note and certain correspondence in reference to it were introduced by the People to prove guilty knowledge. This note was also introduced on behalf of plaintiff in error, in connection with other evidence, for the purpose of proving the absence of guilty knowledge. Merrin testified that he forged this note and turned it over to plaintiff in error at the office of the DeVore Piano Company, and that when the note became due plaintiff in error telephoned him to come to Freeport at once, and when he arrived there explained to him that the bank had sent a notice to Davis; that he accompanied plaintiff in error to his office to devise some scheme to get out of their predicament, as they both knew that the note was forged; that they finally agreed to represent that the wrong Myron Davis had been notified, and Merrin was to make an effort to raise the money and pay the note and send it from another part of the county than that in which Davis resided. This note was found among plaintiff in error's papers in his office after his arrest, and it showed that there was still a balance due of $12.50. This note was taken up by plaintiff in error on January 6. The two re-

mittances were sent by Merrin on January 8 and January 26. The circumstances surrounding the taking up of this note by plaintiff in error and the payments made on it by Merrin, which were represented to be from collections from Davis, tend to corroborate the contentions of plaintiff in error that he had no knowledge that the note was a forgery. By the giving of this instruction the jury were told that this note, as well as all the others, was admitted in evidence solely on the ground that it might tend to show that plaintiff in error had guilty knowledge of the fraudulent character of the note named in the indictment, thus depriving him of all benefit from the introduction of the note in evidence and placing him in the position of having introduced evidence to prove his own guilty knowledge.

In support of his motion for a new trial plaintiff in error submitted his own affidavit and affidavits made by certain other persons. In his own affidavit plaintiff in error states that since his conviction and since hearing the testimony of LaGrange W. Merrin he has been able to ascertain important facts concerning the forged notes which were sent to him by Merrin and discounted at the First National Bank which previous to his trial he had no way of ascertaining. The affidavit then discloses that the original note given by H. S. Garman and Alice Garman was discounted by Merrin at the Forreston State Bank; that Merrin made two duplicates of that note, one of which he sent to the DeVore Piano Company and the other to the George P. Bent Company, of Chicago, as collateral security; that the original note given by Elizabeth E. Garman was discounted by Merrin at the Forreston State Bank; that Merrin made three duplicates of that note, one of which he discounted at the First National Bank of Freeport, another was put up by Merrin as collateral security for a loan made by George B. Turneaure, and the third duplicate was sent by Merrin to the George P. Bent Company; that the original note given by Bokker was discounted at the Forreston State

Bank; that Merrin made two duplicates of that note, one of which he discounted at the First National Bank of Freeport and the other was sent by him to the George P. Bent Company; that the original note given by J. E. and Nettie Ainsworth was discounted by Merrin at the Forreston State Bank; that Merrin made two duplicates of that note, one of which he discounted at the First National Bank of Freeport and the other was sent by him to the George P. Bent Company; that the original note given by Cornelius J. Cordes was discounted by Merrin at the Forreston State Bank; that Merrin made three duplicates of that note, one of which he discounted at the First National Bank of Freeport, another was put up by Merrin as collateral security for a loan made to Merrin by George B. Turneaure, and the third duplicate was sent by Merrin to the George P. Bent Company; that the original note given by Daniel Newcomer was sold by Merrin to J. H. Rice, of Mt. Morris, and a duplicate of that note was sent to the DeVore Piano Company; that the original note given by Frank J. Schelling was discounted by Merrin at the Leaf River bank; that Merrin made two duplicates of that note, one of which he sent to the DeVore Piano Company and the other to the George P. Bent Company; that Merrin also forged and sent to the George P. Bent Company, of Chicago, a duplicate of the forged note purporting to be signed by V. H. Bovey, which he discounted at the First National Bank of Freeport; that the original note given by John Thomas was discounted by Merrin at some place unknown; that Merrin made three duplicates of that note, one of which he discounted at the First National Bank of Freeport, another was put up by Merrin as collateral security for a loan made by George B. Turneaure, and the third duplicate was sent to the George P. Bent Company. The affidavit also discloses that Merrin took at least eighteen other notes from various persons whose names are stated in the affidavit and discounted the original notes at various places and made

from one to three duplicates of each note, one of which he sent to the DeVore Piano Company, another (where more than one duplicate had been made) to the George P. Bent Company, of Chicago, and the third (in case of more than two duplicates) was delivered to George B. Turneaure, as collateral, or was discounted by some other person or bank. The affidavit further states that at least sixteen of the genuine notes mentioned were taken by Merrin upon sales of pianos belonging to the DeVore Piano Company. The affidavit states that plaintiff in error, since his conviction, has learned from parties who have given notes to Merrin and from banks at which Merrin has discounted notes, that over and above the amount of money which the evidence in the case shows he fraudulently obtained and kept, Merrin has defrauded the DeVore Piano Company and the plaintiff in error out of more than $15,000 in cash and notes, and in addition thereto has appropriated pianos, piano players, stools, scarfs and freight, which cost plaintiff in error approximately $5000. The other affidavits, made by officers of banks at which Merrin has discounted notes, by C. H. Bent, of the firm of George P. Bent Company, by George B. Turneaure, and by persons to whom Merrin had sold pianos and from whom he had taken notes, which were submitted with the affidavit of plaintiff in error, in a large measure corroborate the affidavit made by plaintiff in error.

It appears that some time during the trial the books and papers of plaintiff in error, which the State had taken possession of at the time of his arrest, were returned to him, but at what period in the progress of the trial does not clearly appear. It is apparent from the many transactions involved that plaintiff in error was deprived of a full opportunity to make investigation and to prepare his defense in the absence of his books and memoranda. Had these been returned to him, as they should have been upon his request previous to the trial, plaintiff in error no doubt would have been in a position to have discovered many of

the facts set up in his affidavit in support of his motion for a new trial and would have been prepared to have presented them in his defense. · Many of the matters set up in his affidavit would be material if proven, and plaintiff in error made a sufficient showing that the existence of such facts came to his knowledge after the conclusion of the trial, and that he was not able, in the exercise of due diligence, to learn of them sooner. The court should have granted a new trial upon the showing made of newly discovered evidence.

For the errors indicated the judgment of the circuit court is reversed and the cause remanded.

*Reversed and remanded.*